Good morning, your honors, and may it please the court. My name is Samuel Friedland. I'm an attorney with the Missouri Attorney General's office here today on behalf of Appellants Laughlin, Yount, Noiseworthy, and the Missouri Department of Corrections. In denying Appellant's motion to dismiss, or largely denying Appellant's motion to dismiss, the District Court fundamentally erred in its application of three different forms of immunity, which collectively barred four claims Appellee brings against various defendants. Each of these immunities should have judgment on the relevant counts, but provided immunity from responding to the suit overall. I will go through each immunity in turn unless the court has any particular questions on any particular form of immunity. So starting first with counts one and two, the District Court erred in concluding that sovereign immunity did not bar Appellee's claims against the defendant Missouri Department of Corrections. So all parties agree, I believe, that Missouri Department of Corrections is entitled to sovereign immunity on counts one and two, absent these claims falling under some express waiver of sovereign immunity, which must be strictly construed in favor of the state. So the waiver that the District Court found here was that the dangerous condition applied. But the problem for Appellee is that Appellee made no factual allegation, which even if assumed to be true, which we acknowledge is the standard at this point, established that any property of the state was in a dangerous physical condition at the time of the injury, which directly resulted in the injury, and which defendants had actual or constructive notice of. Let me ask you this. So the paper is different. I don't get the paper. But the cameras, we're talking about a prison here, the context. And suppose the cameras were aimed directly at the wall, all of them. So you had cameras, but they're aimed at the wall. Would that be a dangerous condition of the property taking into account that it's a prison? I don't believe so, Your Honor, because I think the Missouri court cases on this make clear that any defect has to be a physical defect. If the lens was broken, there was wiring. Even cameras aimed at the wall would be an allegation of a failure to take appropriate preventative measures. The cameras should have been, additional preventative measures should have angled the cameras differently. But what the Missouri courts have said, and we said a number of cases in our briefing, we've got the Monex-Melmon case, the Christensen case, Bover case. The dangerous condition requires a defect in the physical condition of property. And we point to the Christensen case in particular, where courts said that this type of failure to take preventative measures claim has been, quote, roundly rejected by our courts and court, end quote, as not constituting an exception to sovereign immunity. And Apelli's only response to the significant weight of authority is to argue that these, honestly, decades of Missouri appellate court cases are not binding on this court, and that older Missouri Supreme Court precedent should suggest that all of these recent decisions are somehow incorrect. I'm happy to talk about any one of those particular. I think it's pretty evident from our briefing that none of these cases actually poke any holes in the suggestion that Missouri appellate courts have held over and over and over that there must be some kind of physical defect for this waiver to apply. And then moving on, unless there are any further questions on sovereign immunity, on the question of qualified immunity, so the district court erred when it concluded that qualified immunity did not bar count four of Apelli's complaint as asserted against appellants Laughlin, Yount, and Noiseworthy. So as this court is well aware, just to start with the standard, an Eighth Amendment deliberate indifference claim requires that a plaintiff plead facts demonstrating that a specific defendant in question both had actual knowledge of a known risk to a prisoner's health and that the measures taken in response to this known risk were so inadequate that they were deliberately indifferent. So really the crux of the district court errors, the district court's error here in denying qualified immunity to the individual appellants on count four lies in the fact that Apelli has failed to carry her burden of pleading sufficient facts which even if this court assumes them to be true demonstrate any actual subjective knowledge by any of the individual prison guard appellants or prison official appellants that the decedent had a substantial risk of suicide. Isn't that knowledge and sort of what they knew which, you know, did the various defendants, isn't that sort of typically better for summary judgment which is really what the district court was saying here? Like maybe, maybe not, but this is that motion to dismiss. They don't have to, they can't really prove up knowledge in a motion to, and in the pleadings. I think it's better for a summary judgment if there's disputed factual allegations that can be resolved through discovery. They still have to plead factual allegations that even assuming them to be true at this stage show that either they knew about the risk or that the substantial risk of suicide was so substantially obvious that the, excuse me, that the officials must be presumed to know that this was subjectively at risk. And I think one of the, this court's cases that really shows how heavy this substantially obvious standard is, is the Dabney Anoka County case from this court in 2016 which held that a serious medical need must be so obvious that, quote, that even a lay person would easily recognize, end quote, the need for medical intervention. So that's, that's the standard that their factual allegations have to meet too. And the only factual allegation of any knowledge that any of these individual appellants had was that as prison officials working in the administrative segregation unit, they knew that decedent was put on administrative segregation. But that can't, that does not itself rise to the level of subjective knowledge of suicidality because if that was the case, every time that a detainee in this circuit was placed in administrative segregation, they were told by prison guards not to also place them on suicide watch. Suppose they had, I know there was a suicide attempt a year earlier, I know there were no allegations that these officers knew about it, but suppose it had been in a file or it had made an announcement at a staff meeting, hey, you need to really watch out because this particular prison may, prisoner has committed suicide in the past. Does that change your answer? I think it, I think it may if there was a factual allegation that they were told about this. We might dispute that. If they weren't told, obviously, then that might be a question that's better resolved at summary judgment. But there's no such allegation here. And that's really a problem. We cite, for example, in our briefing, the Whitney v. City of St. Louis as an example where this court does affirm dismissal on the basis of qualified immunity for these kind of deliberate indifference claims at the motion to dismiss stage when the factual allegations as pledged do not rise to the level of, even if true, establishing an objective, or excuse me, a subjective knowledge. Now, appellees... Counsel, isn't it alleged in the complaint that the deceased attempted to commit suicide by hanging previously on, in August of 2020 at another Department of Correction facility? It is, Your Honor. So, so my question is this. Do you think that allegation is just, is just like an untethered factual allegation that has actually, from what I'm gathering, you're saying it has no legal significance in this case? I don't know if I would agree it has no legal significance. I don't think that it I think that there's still the missing link that's fatal to their claim for these individual appellants. There's other defendants that have been named in this case. We are out here on behalf of these three prison guard appellants who don't work at the prison that that occurred at. There's no allegation that they were ever made aware of it. And in fact, I think it's notable that the complaint even acknowledges that a report upon the decedent being placed in administrative segregation said that there were no contraindications for placing the decedent in administrative segregation. So what you have is prison guards who know, again, assuming all these allegations are true, fulsome, know that he was placed in administrative segregation and that a report said there was no contraindication. Well, who are the other defendants that you're referring to that that history of a suicide attempt might, I'm not asking you to make some kind of prejudicial admission, but you mentioned other defendants. Who are they and what were their positions? Absolutely, Your Honor. There's a number of defendants, the medical professionals, for example, we're not representing here that my understanding, and I did not handle this case at trial, but my understanding is that those are non-state defendants. So it's a contracted out medical providers and things like that. We don't represent them here and I can't speak one way or the other to their knowledge, but I certainly can speak to the prison officials, the guards of the administrative segregation's knowledge, because that's really what the kind of missing gap in this qualified immunity analysis is. And I think one case that really highlights this is actually a case where all of the judges on this same panel were involved in, which is the Smith-Dandridge v. Ginalis decision from 2024, where this court held that, quote, it is not enough merely to find that a reasonable person would have known about a risk or that an officer should have known about a risk, end quote. That was on summary judgment, though. It was on summary judgment, but I think there were a lot more facts present in that case, if I recall correctly. There was a whole allegations and there's a history of stabbing the ground and police had arrested him, put him to bed, police arrested him. There was a lot more there. What we're looking at here is just one allegation. He was placed in administrative segregation and therefore, if that's proven true, they should have known that he was at a substantial risk of suicide. The prior suicide attempt, though, does play a role, and maybe this is just irrelevant for this particular case, in showing that he had a serious medical need, right? I mean, it at least shows that. If he committed suicide once before, then he might commit suicide again. We've said that a suicidal risk is a serious medical need. I agree that a substantial risk of suicide is a serious medical need, and prior attempts could certainly relate to that or show that if there's evidence or even an allegation for this stage of knowledge. I think, especially given that that prior suicide attempt happened at an entirely different prison, there's no allegation that these individual prison guards who happened to be in administrative segregation that day were aware at all. And then the other issue I want to briefly touch on that Apelli really faces on qualified immunity is even if she can get over this first time, she still has cited no cases showing that it is clearly established that these prison officials should have or would be imputed to know that this individual, this person, committed suicide solely by placing him on administrative segregation. It was the Apelli's burden to cite cases. We raised that not only before the district court, but in this briefing before this court. Apelli doesn't cite a single case beyond just the standard, showing that it's clearly established that what the prison guards did in placing him in administrative segregation should be impugned upon them to know that he had a substantial risk of suicide. And I think the fact that there's, Apelli can point to no cases on that, is frankly because this court has directly held the opposite. We cite the Perry case in our briefing, where this court squarely held that there is no clearly established constitutional right associated with the failure to take certain steps that would have otherwise possibly been required if there was knowledge of a substantial risk of suicide, if the decedent was analyzed by a medical professional who determined that there clearly established and specific constitutional requirements, quote, do not support the proposition that an officer is required to second-guess a mental health professional's judgment as to the substantiality of a suicide risk. And unless there are any other questions, I do want to make sure I touch on official immunity as well. Finally, the district court erred in holding that count six of Apelli's complaint as asserted against Laughlin, Yount, and Noiseworthy was not barred by the doctrine of official immunity. So Apelli really bases her claim of a waiver of official immunity in count six on a particular prison policy, which as pleaded in the complaint, and we accept as true for the purpose of this argument, requires Appellants Laughlin and Yount to, among other things, make irregular but periodic checks, with no fewer than one check every 30 minutes. So the crux of Apelli's argument seems to be that the language of no fewer than one check every 30 minutes makes the overall act of prisoner checks a ministerial duty rather than one containing any sort of discretion. And Apelli cites some cases from the teens, the 20 teens, from this court saying as such. But recent Missouri state court precedent really makes clear that whether an act falls under the official immunity waiver is determined not by focusing on any one particular element. That might be mandatory, but to quote the Missouri Supreme Court in Cunningham, whether, quote, the nature of the act itself is ministerial. And I think that Cunningham's kind of interesting in light of our previous case law on it. Because if I understand, Cunningham really talked about, wasn't it training and engaged, like the verbs that they used were not 30 minute check. And I'm trying to figure out how to put those two together. Because it would be hard to think of a task in sort of a custodial setting that didn't have some kind of discretion, just given the nature of what they're doing. And so would this be something we just need some more information about, whether this 30 minute check is ministerial or is it more like, I don't know, the training and ensuring certain compliance that was in Cunningham? I'm glad you asked that. So first on Cunningham, I think one of the allegations was a failure to provide a protective truck, which they asserted was mandatory and there was no protective truck provided. But I also think that this court has a bang on Missouri Supreme Court example that happened only a couple months before Cunningham. And Cunningham really kind of incorporates in its decision, which is the state ex moralis case. Because there, the plaintiff, as the next friend of a decedent, brought really a similar negligence claim, asserting that official immunity did not apply because state officials allegedly failed to comply with a policy mandating that they check on a decedent in their care every 30 minutes, just like here. According to the plaintiff in moralis, the officials failed to comply with this 30 minute check and instead left the decedent alone for two hours, just like here, during which time the decedent died by hanging. So the Missouri Supreme Court in moralis squarely rejected the argument that appellee attempts to bring here, that these policies requiring checks every 30 minutes rendered the act ministerial. Although the state employees were required under the policy to run these checks every 30 minutes, the Missouri Supreme Court said that it still remains that other parts of that act, such as deciding whether to reposition the decedent when you do that 30 minute check or whether the decedent needed additional care, were still discretionary. What would be a purely ministerial act under the moralis case? Sure. The examples I think that the Missouri Supreme Court relies on are, you must stamp a document. And I appreciate that that is a very narrow category, but I think that's what the Missouri Supreme Court has said is a truly ministerial act. I think that you look at the cases of the Missouri Supreme Court, they apply it very narrowly under the recognition that official immunity, as any other form of immunity, must be narrowly construed in favor of the parties asserting that immunity. Well, I have a question. I want to follow up because moralis was about where they talked about the writ of mandamus as the appropriate remedy. But I don't know how clean of a fit that is because, for example, we issue writs of mandamus to lower courts, but how to decide a case is discretionary. And when to decide a case is discretionary. So have the Missouri courts, particularly the courts of appeals, have they had a chance to interpret that? I just don't know if that's a... I mean, certainly we would not issue a writ of mandamus on a single prisoner or Missouri court saying you have to check on him every 30 minutes. That's not what courts do. But at the same time, it's not a great fit. Well, I think under Missouri law, writs of mandamus are issued by Missouri courts when a Missouri court deems that an act is ministerial. So I don't think that there's any daylight between when a Missouri court issues a writ of mandamus and when a Missouri court would... or under Missouri law, I should say, an act is ministerial. Because they're one in the same and they are rarely issued. But I think that goes exactly to how narrow Missouri law applies not only writs of mandamus but ministerial acts. One other point I want to briefly touch on before my time runs out. It is certainly at least not the case that Noiseworthy as a supervisor is entitled to official immunity on count four. The only breach of duty that appellees allege against Noiseworthy... or count six, excuse me. The only breach of duty that appellees assert against Noiseworthy in count six is the claim that Noiseworthy negligently and carelessly failed to supervise the other officials. The district court overruled official immunity without, as we show in a brief, properly analyzing Noiseworthy's policy. And I think Cunningham really squarely shows that the act of supervising using the word ensure is all heavily discretionary and is exactly the kind of conduct that official immunity is meant to protect. And unless there are any other questions, I would like to reserve the balance of my time. Thank you, your honor. All right. Thank you, counsel. Mr. Pihanna. May it please the court. You may proceed. Counsel. Your honors, I represent the plaintiff appellee Christine Williams individually and on behalf of three minor children of the decedent in this case, Austin Dakota May. We are asking you today to affirm the ruling of the district court denying the motions to dismiss of the appellants in all respects. I would prefer to organize my time in three parts. First, addressing the defense of qualified immunity raised. Then I'd like to move to the defense of official immunity raised in response to the state law wrongful death claims. And finally, I would like to address the claim, claiming an exception to the sovereign immunity statute for a dangerous condition of the property of the Missouri Department of Corrections. As a threshold matter, and this was discussed a little bit during appellant's argument, I'd like to ask that the court keep in mind the standard of review that we are here on today. This is an interlocutory review of a denial of a motion to dismiss. The court engages in a de novo review of the rulings of the district court. To survive a motion to dismiss, the complainant must contain, or the complaint, must contain sufficient factual matter, except it is true, to state a claim to relief that is plausible on its face. A claim is facially plausible when the pleaded facts permits the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Although more than mere labels and conclusions, naked assertions, or a formulaic recitation of elements of her claim must be pled. She need not allege facts in painstaking detail, and the facts alleged must be enough to raise a right to relief above the level of speculation. I would posit that we have done that. So under the deliberate indifference qualified immunity standard, the plaintiff must assert a violation of a constitutional or statutory right. That right must have been clearly established at the time of the violation, and we must show that the defendants were deliberately indifferent to that constitutional right. It's well established that the Eighth Amendment prohibits cruel and unusual punishment, and that that extends to protect prisoners from deliberate indifference to serious medical needs. It is also well established as of June 11, 1994, this is from the Relegate case, that a risk of suicide by an inmate is a serious medical need. I think it's undisputed that the issue in this case is the level of knowledge of the individual defendants regarding the suicide risk of Mr. May. The standard for knowledge, as counsel I think pointed out at a point in his argument, was set forth by this court in the Smith-Dandridge case. Knowledge does not require strict subjective knowledge. The district court can infer knowledge if the risk was obvious. If the defendants were exposed to information concerning the risk and thus must have known about it, a finding of deliberate indifference may be warranted. As was discussed earlier, Mr. May had a prior suicide attempt almost exactly a year to the date of his successful suicide attempt. What allegations are there that the defendants here knew that? I think that you've probably proven indifference, but the deliberate part is missing, which is being able to infer subjective knowledge on these folks' part. Right, Your Honor. I would argue that at this point, being the motion to dismiss position that we're in, I would argue that it's a reasonable inference to draw that these defendants possess the same knowledge of the institution. There's what's called an SR3 form completed after the failed suicide attempt that noted Mr. May was a low but moderate suicide risk. That report should have followed him to the new jail, at which point it would have been in his file. I think it's a reasonable inference to draw that the defendants would have been or become aware of that at some point. But we don't have an allegation as to that fact of the complaint, the SR3, do we? There is an allegation regarding the SR3, Your Honor. But no evidence that they would have seen it as a matter of course. So I could see that creating the inference as you say, well, the prison guards who are guarding him necessarily see the SR3. It's normal practice, ordinary practice. So we can assume they did. But if it's the contrary, then obviously they wouldn't have seen it. Correct, Your Honor. And I'm not standing before you here today telling you that there is an allegation in the petition specifically that there was information communicated to these defendants that Mr. May wasn't expressed suicide risk. I'm not going to tell you that. What I will argue is that there were sufficient signs that he was an obvious suicide risk. And what I didn't hear mentioned during appellant's argument was the allegations that we made regarding this standard operating procedure 12-4.1, which instructs these officers to be specifically aware to risks of identified suicidal tendencies in prisoners. Those risks that were identified in the department's own policy were that offenders receiving information related to new or additional charges, institutional proceedings or denial of parole or pending release after a long period of incarceration. That could be one potential sign of a suicidal offender. Receipt of bad news regarding themselves or families such as serious illness or loss of a loved one. That could be another sign. Threats of suicide, sad tearful behavior or reduced emotional reactivity or significant changes in circumstances. And so what the complaint alleges is that there was a task order signed placing Mr. May in administrative segregation pending an August 6th hearing to determine whether or not he was going to be placed in long-term segregation. And if you'll also remember in the complaint, there is an allegation that at a prior visit with one of the qualified mental health professionals, it was identified that Mr. May was, or his symptoms, that being the anxiety, depression, things like that that he was being treated for, would specifically be increased or exacerbated by segregation. No mention of that was made in the report completed determining whether or not it was appropriate to place him in long-term segregation. But he was placed in administrative segregation pending this decision on long-term segregation nonetheless. What do we do with the fact, my understanding is the nurse said he should, did not make a determination, I shouldn't say not, but did not make a determination that he should be placed on suicide watch. That's my understanding of what the nurse said and that there were no contraindications to placing him in administrative segregation. There were no contraindications to placing him in segregation. That's the specific allegation. Okay. And my understanding of suicide watch just in this context, your honor, is that it's kind of a severe treatment. You go into a room where all of your things are removed, you're placed in a jacket where you can't harm yourself and things like that. But regardless of that finding, these officers were trained on these specific aspects of identifying a suicidal inmate, potentially suicidal inmate. My point being that several of these were present with Mr. May and just happened to coincide the temporal proximity to his placement in long-term segregation represented a significant change in his circumstances, represented bad news. He knew that this decision was going to be coming down August 6th as to whether or not he was going to be placed in long-term segregation. So he was teed up to exhibit all of these risks that were departmentally identified in this policy that these defendants would have known about. So we believe that we've met the standard at this stage, at the pleading stage, to show that these particular officers were exposed to obvious risks that are contained in the department's own policy to have identified Mr. May as a potential suicide risk. So then moving to the deliberate indifference standard. So then what occurs the following day after this task order is signed, Mr. May is left in his cell for a period of no less than two hours and 48 minutes without any checks on his well-being performed. And the defendants, that being Mr. Laughlin, Mr. Yount, and also Sergeant Noiseworthy, were responsible for checking on Mr. May during that period. The appellants argue that there are no allegations at this particular stage that the officers subjectively appreciated Mr. May's suicide risk. At the pleading stage, the plaintiffs are not required to attach each officer's training file. The question is whether the complaint permits a reasonable inference that the defendants were exposed to information from which they must have known of the risk. Under Smith-Dandridge, we believe this is sufficient. If there are no questions regarding the qualified immunity issue, I'd like to move to official immunity. I think I have something to add to the discussion of the official immunity issue, especially when it relates to ministerial duties, as it was discussed during the appellant's argument. And what I would suggest is that the court go back to the test that the Missouri Supreme Court created to determine specifically when a duty is ministerial versus discretionary. That's found in the Souther's decision. And in that decision, the court said that the determination of whether an act is discretionary or ministerial is made on a case-by-case basis, considering the nature of the public employee's duties, the extent to which the act involves policymaking or exercise of professional judgment, and the consequences of not applying official immunity. We obviously rely on the Letterman case from this court, which decided that checks extremely similar to the ones present in this case were ministerial. The checks in that case, I would argue, actually involved a bit more discretion than the checks here. There were allegations that the checks were improperly performed. The decedent in that case was not checked for breathing, the rise and fall of his chest, and things like that. Our allegations in this case are simply limited to the fact that five successive periods, five successive 30-minute periods passed while Mr. May was in his cell where zero checks were performed. What about Morales? Morales is so similar. And I'm frankly stunned at how limited Missouri official immunity may be after Cunningham and Morales. But Morales at least involved somebody, I think it was on a every 30 minutes. I mean, it's really pretty darn close to this case. And I tend to agree, Judge. But what I would argue, and that's why I mentioned it at the outset, is that we go back to the Southers case. Because in the Morales case, what we were dealing with was a severely disabled individual who relied on his caretakers for absolutely everything. He was immobile. He needed to be turned. And the source of those allegedly ministerial duties arose from what's called an individualized support plan or an ISP. So the source of the rules that were at issue that were claiming to be ministerial were by their very nature created for one individual, one single solitary individual. They were not departmentally mandated rules that were widely applicable to an entire wing of prisoners, for example. If we go back to the Southers case and apply the test that's set out in Southers, I think that Morales reached the right decision if we looked at those factors individually. So first, we have to determine what's ministerial versus discretionary on a case-by-case basis. So we can't just say because Morales decided that that was discretionary, then it's also discretionary here. What we have to look at first is the nature of the public employee's duties. Well, the nature of the public employee's duties in Morales tended to be much closer to what we would consider medical care for this particular individual. They had a living document that was created by this individual's caretakers, his doctors, physicians, things like that. It states that in the opinion. And they had to govern themselves by that document with this one particular individual. They were not applying a broad, wide-set set of rules to the disabled individual in this room, and then the next room, and then the following room. I get that, but the theory of a deliberate indifference claim is based on a serious medical need and the need to provide care. And I get it. Suicide feels a little different because it's not, I'm sick, my arm hurts, or whatever. I broke my arm and they're not treating me. But the theory of it is basically the same. You're providing medical care to the plaintiff, and the lack of checking in is sort of the equivalent of medical care in a deliberate indifference claim. I think so, Judge. I guess I'm misunderstanding the official immunity defense would apply to this case. Oh yeah, you're right. You're right. Yeah. But I guess my point is it's sort of similar. I am mixing and matching. You're absolutely right. But it is similar in the sense that there's a medical undercurrent to all of that. And you see that in the qualified immunity claim. And maybe it doesn't transfer cleaning clearly to official immunity, but I still think that I'm not sure that distinction is as strong as you say it is. That's really what I'm getting at. I understand what you're saying, Your Honor. I think I would tend to think that the checks for the prisoners specifically are designed as safety checks. Everybody's okay. We're looking in their windows. Everybody is upright. If they're sleeping, we can tell that they're sleeping. If they're not, if something's wrong, we'll do something. The ISP, on the other hand, is something that, especially if we get into the second element of the Souther's test, that arm of the Souther's test is the extent to which the act involves policymaking or exercise professional judgment. In caring for this disabled individual in the Morales case, there would have been a high degree of professional judgment that these individuals would have needed to employ to decide when he needed certain things, when he needed to be checked on, how tight his restraints needed to be. He was not hanged. He was fastened to a chair, and he slipped down in the chair and ultimately asphyxiated. So what is the specific acts that you think, under the allegations of the complaint, are alleged to be ministerial? No discretion? One check had to be performed in a 30-minute period. These officers had no discretion to not perform a check within a 30-minute period. That's the primary allegation. I would also add that there's an allegation that when the check is performed, they have to record it to let other officers know that it was performed. But that is the crux of our case. I think one thing that kind of clouds this a little bit is the policy has this language, fewer than one check every 30 minutes. But what you're saying is you're relying on the at least every 30 minutes. There can be no less than one check every 30 minutes. While they can check more, that's within their discretion. But non-discretionary as to one check every 30 minutes. Yes, Your Honor. And they failed to do that within five successive periods. On that point, I just want to follow up on one last question. Writ of mandamus. Morales seemed to think that a writ of mandamus was sort of the dividing line. Again, I'm not sure that's right. But could a Missouri court issue a writ of mandamus forcing them to check on people at least once every 30 minutes? Is that something that would be subject to that? I apologize, Judge. I don't know that I could speak intelligently to that. I'm obviously familiar with the language in these decisions that says that a ministerial act is basically a clerical one, which I think is where that comes from. Again, I'll revert back to the Southers test that I think if we get back there and we apply that test, then we get to where we need to be to find that this was in fact ministerial. I'm running out of time here, Your Honors. I want to briefly address the dangerous condition exception to sovereign immunity that we've alleged. And the Christensen case, I agree, speaks to purely surveillance-type dangerous condition allegations. And the fundamental difference that we have in this case is that there was a repositioning of property at the jail as to Mr. May's door that created a dangerous condition. And those are alleged to be part of the structure, is that right? Because I think the Christensen case, if I understood it correctly, they were saying you should have had these in the stairwell, not that what you had wasn't working? Correct, Judge. From what I understand of the Christensen decision is there was no allegation that there was anything about the cameras that did exist that was defective. So Christensen did have cameras? I believe so. I believe there were cameras. Because it does seem that cameras in a custodial setting, some kind of correctional facility, just are kind of fundamentally different than the choices to whether have cameras in stairwells or areas of the school for just kind of monitoring. It seems sort of I guess is my point in a correctional facility. And I don't know if, one, that's true, and two, whether that makes a difference. I don't know that that makes a difference with respect to this particular defective condition. Because the cases, as I understand them, Judge, and as I think they've developed, is that there has to be some sort of repositioning or change to the condition of the property, which in this case would include the cameras. That's why I— I thought there was sort of some pushback that the cameras were not really part of the physical— Not necessarily that the cameras were not part of the physical plant of the facility itself, but that they were mispositioned so as not to be able to view the inside of Mr. May's cell. And that's ultimately what makes the paper covering up the viewing window to the door of his cell defective as well. Because the entire intent of having that viewing window and being able to see inside his cell is the ability to perceive the danger of Mr. May committing suicide or any other prisoner. That's the Henley case, I believe is the closest one to this, where we had the down stop sign, which caused the driver of this vehicle to be unable to perceive the danger posed by this intersection and oncoming vehicles, which ultimately led to the collision that injured the plaintiff. So we would argue that the dangerous condition in this case is much closer to the Hensley decision, where we had a rearranging of items on property as opposed to just the presence or the property existing as intended and it's alleged to be in a dangerous condition. If there are no further questions, I think I'm about out of time. Thank you. Counsel, you have almost two minutes. You may proceed. Thank you, Your Honor. To start first with the topic that the court ended on of sovereign immunity, paper is not a physical defect with the window itself. And even separate from that, I think that that claim really fails for a couple reasons. We highlight how Appellee has failed to establish all the other elements in our brief. I think one of the ones that I do want to flag is that they never establish, even if this court found it's a physical defect, which it isn't, any kind of constructive or actual notice, which is also required for sovereign immunity. And Hensley is not a close case because it was an entirely different statutory sovereign immunity waiver related to defects in the design of roads that is not relevant here. Now, going to official immunity, I think, again, it's telling that Appellee relies exclusively on cases that predate both Morales and Cunningham. First, Morales and Cunningham, neither of them put any stock on Appellee's theory, or I should say at least Morales doesn't put any stock on Appellee's theory about individual plans or anything like that. Both assumed that the check, well, Morales, they assumed that the check was mandatory. In Cunningham, they assumed that the protective vehicle was mandatory and still held that there were some elements that were discretionary. The checks that were providing the protective vehicles and other safety equipment was not a ministerial act that could be compelled by a writ of mandamus. And frankly, an individualized plan feels a heck of a lot more ministerial in Morales than a policy addressing all of the detainees in administrative segregation. And finally, with my last few seconds, the standard operating procedures in reference to that is just an attempt to create a reasonable person standard that says nothing to subjective knowledge, especially given the vagueness of that policy. Unless there are any other questions, we would ask that this Court reverse on counts 1, 2, 4, and 6. Thank you. Thank you, Counsel. The case has been well argued and it is submitted. The Court will render a decision in due course. You may stand aside.